No. 15-0021 – *State of West Virginia v. Stephanie Elaine Louk*

FILED

**May 27, 2016**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

Benjamin, Justice, concurring:

Words are inadequate for the tragedy occasioned by Ms. Louk's injection of methamphetamine into her body in her thirty-seventh week of pregnancy. Because of her actions, an innocent child is dead. While I have dedicated much of my service in the judiciary to helping individuals take responsibility for their decisions, overcome their addictions and turn their lives around, I cannot personally excuse the decision taken here by Ms. Louk—a decision which not only harmed herself, but which also resulted in the senseless end of the life of another. However addiction may explain irresponsible behavior, it does not excuse it. What Ms. Louk did was wrong. If I were to step away from my duty to follow the law, and to instead make it, I might be tempted, as others, to affirm this conviction.

The law is inadequate to address this tragedy. However much I might believe that Ms. Louk was wrong, the decision of whether actions such as hers are criminal is that of the West Virginia Legislature. That is the essence of a government and a judicial system based upon the constitution, the rule of law, and the fundamental precept that the policy of this state is the prerogative of the political branches of government—not a handful of judges making decisions behind closed doors. Our Legislature has chosen not to criminalize behavior such as Ms. Louk's. No amount of wishful thinking or artful reading of our law permits another conclusion. The

1

unambiguous laws at issue, West Virginia Code § 61-8D-4a (1997) and West Virginia Code § 61-8D-1 (2005),[1] are as plain as they are specific—they do not provide for the criminal prosecution undertaken herein of Stephanie Louk under these facts. And while, out of a desire to assuage a personal sense of outrage, it may be tempting for a judge to here engage in activism under the guise of supposed statutory interpretation, it is beyond this court's legal and constitutional province to make criminal that which the legislature has not.

Pursuant to West Virginia Code § 61-8D-4a, a parent is guilty of a felony if that parent "neglect[s] a child under his or her care, custody or control and by such neglect causes the death of said child." As used in this section, "'[c]hild' means any person under eighteen years of age not otherwise emancipated by law." W. Va. Code § 61-8D-1. As reflected in the majority opinion, West Virginia Code § 61-8D-1 unambiguously refers to a child in being, not the unborn. Had the Legislature intended "child" to include the unborn, it would have expressly said so, which it has done elsewhere in the Code.

Contorting West Virginia Code § 61-8D-1 to include the unborn within the definition of a "child" creates irreconcilable conflicts between the provisions of article 8D, chapter 61 and other provisions in the Code. For example, under West Virginia Code

---

[1] This statute was amended in 2014, but the changes did not affect the definition of "child" as it appeared in the 2005 version of the statute.

2

§ 61-8D-2a, it is a crime for a parent to knowingly allow another person to inflict upon their child any impairment of physical condition that results in death to the child. If "child" includes the unborn, West Virginia Code § 61-8D-2a would criminalize behavior explicitly excluded as criminal behavior elsewhere in the Code. *See* W. Va. Code § 61-2-30(d)(1) (2005) (excluding the acts of a pregnant woman with respect to the embryo or fetus from giving rise to prosecution under the Unborn Victims of Violence Act); W. Va. Code § 16-2M-6 (2015) (providing that "[n]o penalty may be assessed against any patient upon whom an abortion is performed or induced"). It is illogical to assume that the same legislature which immunized a woman from prosecution for receiving an illegal abortion, such as a late term abortion, nevertheless intended to permit the prosecution of a woman for taking drugs during pregnancy that ultimately resulted in the death of her fetus or subsequently born child.

A similar absurdity arises when forcing the nearly identical definitions of "child" in other sections of the Code to include the unborn. For instance, in the article addressing grandparent visitation, West Virginia Code § 48-10-202 (2001) defines "child" as "a person under the age of eighteen years who has not been married or otherwise emancipated." This definition is almost a mirror image of the definition of "child" provided in West Virginia Code § 61-8D-1. If the Legislature had intended that "child" include the unborn in West Virginia Code § 61-8D-1, then the substantively identical language in West Virginia Code § 48-10-202 must also include the unborn. It would necessarily follow, then, that grandparents could file a motion or petition for

3

visitation with a fetus. *See* W. Va. Code § 48-10-301 ("A grandparent of a child residing in this State may, by motion or petition, make application to the circuit court or family court of the county in which that child resides for an order granting visitation with his or her grandchild."). Likewise, fetuses could be subject to custody determinations under the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA"), W. Va. Code § 48-20-101 to -404. *See* W. Va. Code § 48-20-102 (2001) (defining "child" as "an individual who has not attained eighteen years of age"). Unmistakably, straining the grandparent visitation statutes and the UCCJEA to apply to the unborn defies common sense, just as it does in West Virginia Code § 61-8D-4a.

Though perhaps emotionally tempting, stretching West Virginia Code § 61-8D-4a to permit this criminal prosecution to stand, *i.e.*, the prosecution of a woman for acts committed during pregnancy that contribute to the death of a subsequently born child, renders the statute hopelessly vague. What conduct would constitute unlawful neglect? Would the failure to seek prenatal care constitute neglect if the subsequently born child dies? Could eating raw oysters during pregnancy, which is commonly known to carry a risk of food poisoning, be considered neglect? At what stage in the pregnancy would any such acts be neglectful? Would all the mothers of newborn children that die be the potential subject of investigations to determine if any of their activities while pregnant contributed to the death of their children?[2]

---

[2] A study examining pregnant women between 2008 and 2011 revealed that more than 1 in four pregnant women in West Virginia smoked during their pregnancies. David Boucher,

4

My personal outrage at Ms. Louk's actions is admittedly driven by frustration. No matter how much I may wish to simply judge under the law, I cannot ignore or forget the victim here. This child should today be playing, laughing and engaging in the things children do. This child was a victim. If there is a victim, one might expect that there should be a crime. But, no matter how much others may argue to the contrary, here the legislature has decided otherwise.

I recognize that the Legislature was faced with many considerations in making the public policy as it relates to the facts of this case. My personal concerns, which are based upon the facts of this case, are in no way meant to minimize or disregard such other considerations. Aside from the statutory conflict and vagueness that would result from the State's position, there are overriding health and safety concerns which the legislature could look to in justifying the immunization of pregnant women from prosecution for things they may do to themselves—such as ingesting harmful substances—that may harm fetuses they carry. Chief among these is the concern that

_Many Pregnant Women in WV Smoke, Health Data Shows_, Charleston Gazette-Mail, September 16, 2014, http://www.wvgazettemail.com/article/20140916/DM01/140919386/1420. Data collected by the U.S. Centers for Disease Control and Prevention showed that in 2011, 29% of pregnant women in West Virginia smoked during their pregnancies. _Id._ West Virginia had the highest rate of pregnant smokers in the nation between 2008 and 2011. _Id._

pregnant women may not seek health care that might be of great benefit to them and their unborn children for fear of criminal prosecution.[3]

Regardless of any feelings we may have regarding what the law *should be*, the Legislature announces what the law *is*, and it has defined "child" in West Virginia Code § 61-8D-1 to exclude the unborn. Were this Court to itself legislate West Virginia Code § 61-8D-4a to include the unborn, which would brush aside succinctly stated statutory language, this Court would engage in the worst kind of result-oriented judicial activism.

---

[3] Two years ago, the Tennessee Legislature enacted a "fetal assault" statute that permits the prosecution of a woman who gives birth to a child that is addicted to narcotics or harmed as a result of the woman's illegal narcotic use during pregnancy. Tenn. Code Ann. § 39-13-107 (2014). The statute excludes from punishment women who are "actively enrolled in an addiction recovery program" before delivery as long as they successfully complete the program after delivery. *Id.* The statute includes a sunset clause whereby it is set to expire on July 1, 2016. *Id.*

The penalty provided in the Tennessee law was intended to act as an incentive for drug-addicted pregnant women to either avoid illegal drug use or to enroll in a drug treatment program before delivery. Sheila Burke, Doctors Applaud End of Tennessee's Fetal Assault Law, Associated Press, April 1, 2016, *http://bigstory.ap.org/article/08ce8448799148bf852babadc33d1aef/doctors-applaud-end-tennessees-fetal-assault-law*. According to Tennessee doctors, however, fear of prosecution drove some pregnant women using illegal drugs "to avoid prenatal care[,] . . . exposing their babies to more risks while failing to reduce the astronomical costs of treating newborns who suffer from drug withdrawal." *Id.* Furthermore, since the fetal assault law was enacted, there has been no decrease in the number of afflicted children born. *Id.* With no observable decrease in children born to drug-addicted mothers and with reports of pregnant women avoiding seeking health care for fear of criminal prosecution, Tennessee legislators voted not to extend the law passed its expiration date. *Id.*

As a judge following the rule of law, this must be my decision. But let me be clear: While the legislature has chosen not to criminalize the type of behavior in which Ms. Louk engaged, she factually *was* responsible for the death of her child. I pray that she recovers from her addiction.